UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANIEL GOLODNER,<br>        Plaintiff,<br>                v.<br>CITY OF NEW LONDON, CT &<br>MARGARET ACKLEY<br>        Defendant. | No. 3:14-CV-173 (MPS) |

**RULING AND ORDER**

Daniel Golodner has sued the City of New London and its chief of police, Margaret Ackley, under 42 U.S.C. § 1983 for violations of the Fourth Amendment because New London police officers entered his driveway and backyard four times in five years, most recently after reports of criminal activity. He says that the defendants have violated his right to be free from unreasonable searches. The following claims are pending: (1) a claim against the City of New London for violations of the Fourth Amendment under a municipal policy and (2) a claim against Chief Ackley in her individual capacity for failing to train her officers.[1]

The defendants have moved for summary judgment (ECF No. 39) and the plaintiff has filed a cross-motion for summary judgment (ECF No. 49). The parties disagree whether (1) portions of the plaintiff's claims are barred by the statute of limitations, (2) there is sufficient evidence of a constitutional violation, (3) the City had a municipal policy or custom that caused the constitutional violations, (4) Chief Ackley failed to train her officers to comply with the Fourth Amendment, and (5) Chief Ackley is entitled to qualified immunity. I grant the motion for summary judgment and deny as moot the cross-motion for summary judgment because no reasonable juror could conclude that the City had a municipal policy or custom of the sort

---

[1] The plaintiff withdrew his claim against Chief Ackley in her official capacity. (ECF No. 68.)

asserted by the plaintiff or that Chief Ackley was deliberately indifferent to Mr. Golodner's constitutional rights by failing to train the New London police force.[2]

Because no reasonable juror could find that there was an official policy or custom to deprive citizens of their Fourth Amendment rights or that Chief Ackley is liable for a failure to train her officers, I do not reach the issues of whether Chief Ackley is entitled to qualified immunity or whether a constitutional violation occurred. *See Ashwander v. Tenn. Valley Authority*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

## I.    Background

The following facts are undisputed, unless otherwise noted.

### A.    Mr. Golodner's Property

Daniel Golodner lives at 95 Colman Street in New London, Connecticut. (ECF No. 39-3 at 3.) The house, which has several no trespassing signs, is set back about fifteen feet from the road and has a gate on one side for foot traffic and a gate on the other side for vehicles. (*Id.* at 5–7.) Behind the house is a carport and garage. (*Id.* at 7, 12.) The parties dispute whether neighbors can see into the yard and quibble over the exact location of a fence at the property. (ECF No. 47 at ¶¶ 9–11.) The plaintiff's driveway is partially obscured from view by a fence. (*See* ECF No.

---

[2] Mr. Golodner asks me to deny the motion for summary judgment because at 45 pages, it is over the 40-page limit set forth in the local rules. *See* D. Conn. L. Civ. R. 7(a). The defendants have complied with Local Rule 7(a) because a memorandum may exceed 40 pages with permission from the Court. The motion for summary judgment was filed while the case was assigned to Judge Vanessa Bryant. Judge Bryant allows a 46-page limit. (ECF No. 4 at 3.) The parties dispute whether the plaintiff's cross-motion for summary judgment should be denied because it is untimely. (ECF No. 56 at 2; ECF No. 57 at 1–3.) I consider the cross-motion for summary judgment, even if untimely.

47-9 (providing photographs of the plaintiff's property).) A fence runs along the back of the property. (ECF No. 39-3 at 9.) There is no fence at the front of the property. (*Id.* at 24.)

### B.    Police Officers Enter Mr. Golodner's Property

On May 18, 2006, two New London police officers entered Mr. Golodner's backyard because a neighbor complained that the plaintiff had been "harassing and threatening his family for some time." (ECF No. 39-6 at 2–3.) The plaintiff denies that the officers were invited onto his property. (ECF No. 47 at ¶ 23.) He points to the police report from that day. (*Id.*) The report states:

> These officers observed an occupied parked vehicle in the rear of 95 Colman St[reet] and as we began to approach it an individual, later identified as Daniel Golodner, quickly exited the car and began to approach these officers. Before these officers could explain our reason for being at this location Golodner exclaimed that he wanted to make a complaint against his neighbors, the Cordero's. [sic.] Golodner immediately began claiming that he had been threatened by the Coredero's [sic.] prior to the arrival of these officers. Golodner stated that he had a witness to the incident and that he wanted to make a formal complaint.

(ECF No. 39-6 at 3.) The officers spoke with Mr. Golodner about the complaint and left. (*Id.*; ECF No. 39-8 at 3–4.)

On May 24, 2006, an officer issued a misdemeanor summons and complaint to Mr. Golodner for breach of peace in violation of Conn. Gen. Stat. § 53a-181. (ECF No. 39-9 at 2.) The officer reported that Mr. Golodner had been tailing his neighbor in a car and then punched his neighbor in the face through a car window, after the neighbor braked suddenly. (*Id.* at 4.) On May 25, 2006, a police officer applied for an arrest warrant for the plaintiff's conduct on May 18th and 24th. (ECF No. 39-7 at 2–3.)

On August 22, 2008, two land surveyors attempted to enter Mr. Golodner's property. (ECF No. 39-10 at 2.) Mr. Golodner "called for aid from the police." (ECF No. 47-1 at 44.) When the police arrived, the land surveyors presented to the officers a copy of a Connecticut

3

statute that bars suits for trespass against licensed surveyors. (ECF No. 39-10 at 3.) According to

the police report, "Golodner became enraged, and stated he was calling the shift commander.

Golodner proceeded to slam the front door of his house after he went inside."[3] (*Id.*) An officer

escorted a surveyor onto the property. (*Id.*; ECF No. 47-1 at 23–24.) The plaintiff exited his back

door and was arrested after he drove his car at an officer and a surveyor. (ECF No. 39-10 at 3.)

This is how the Connecticut Supreme Court, in the resulting criminal case, described it:

> The defendant then entered his van, started the engine, put his foot on the gas and "floored" it, then put the van into drive and drove the van with its tires squealing directly at [an officer and a surveyor]. The defendant then slowed the van down, but did not come to a complete stop, and resumed driving it at [the officer and the surveyor]. [They] took several steps backward and out of the way of the oncoming van, which stopped close to the fence.
>
> After the defendant's van came to a stop, [a sergeant] ordered [an officer] to arrest the defendant. [The officer] opened the driver's side door of the van, informed the defendant that he was under arrest, reached inside and put the van in park. The defendant then kicked [the officer] in the chest and closed the van door on her person. [The officer] ordered the defendant to get out of the van and, when he refused, and [sic.] reached inside the van and attempted to pull him out as he held on to the van's steering wheel. The defendant "cocked [his hand] back to swing" at [the officer], and she "took her swing" and hit him in the face. [The sergeant] told the defendant to stop resisting and that he was under arrest. [The sergeant] threatened to taser the defendant, who then exited the van and ran away in the direction of his home.
>
> [The sergeant] chased after the defendant and caught him, put him in a bear hug and took him to the ground on the second attempt. [The sergeant and the officer] continued to struggle with the defendant for "about a minute" before they were able to subdue him. Consequently, the defendant was arrested and transported to the police department.

*State v. Golodner*, 305 Conn. 330, 333–37 (2012).

---

[3] In the plaintiff's Local Rule 52(a)(2) statement, he denies these facts "as characterized." (ECF No. 47 at ¶ 37.) The plaintiff refers to portions of his deposition, but his testimony does not create a genuine dispute of material fact over whether Mr. Golodner was enraged upon being told that the men had a right to enter Mr. Golodner's yard. In the cited portion of his deposition, Mr. Golodner did not discuss his affect, his disposition, or whether he slammed the door of his house. (ECF No. 47-1 at 22–24.)

A few years later, on February 16, 2011, a New London police officer received a complaint that Mr. Golodner was harassing his neighbor. (ECF No. 39-13 at 3.) The neighbor reported that Golodner had been "showing her his middle finger and punching his hand in a menacing manner while looking at her" daily for the past two years. (*Id.*) The officer walked onto the plaintiff's property, apparently to look for him, but did not find him. (*See* Video Recording of February 16, 2011, ECF No. 39-14.)

On September 23, 2011, Waterford Police arrived at Mr. Golodner's home to investigate a report of domestic assault that had occurred at a Wal-Mart in Waterford.[4] (ECF No. 39-15 at 3.) According to the Waterford Police Department's "Incident Report Narrative," Mr. Golodner was "screaming obscenities at an Asian female" inside the store. (ECF No. 39-16 at 3.) She was barely five feet tall and had "a very slim build." (*Id.*) Mr. Golodner allegedly hit the woman twice in the "head with his closed right fist." (*Id.*) After a witness said she would call the police, Mr. Golodner told the Asian woman "if the police come my government is going to send you back to your country." (*Id.*) New London and Waterford police saw on Mr. Golodner's property the same vehicle that Mr. Golodner and the woman used to leave Wal-Mart. (ECF No. 39-16 at 7.) The officers knocked on the plaintiff's front door. (ECF No. 39-3 at 18.) The plaintiff would not answer. (*Id.*) The officers went to the backdoor. (*See* Video Recording of September 23, 2011, ECF No. 39-17.) The plaintiff would not answer that door either; he shouted at the officers to leave, which they did. (*Id.*; ECF No. 39-3 at 18.)

---

[4] Mr. Golodner objects to the Court's considering these facts on the ground that they are hearsay. (*e.g.*, ECF No. 47 at ¶ 53.) The police reports are likely admissible as business records. As for hearsay contained within those reports, the Court does not consider the statements for their truth but, rather, only to show why the police entered the property.

### C.     New London's Response to Golodner's Complaints

Margaret Ackley became the Chief of Police of the New London Police Department in 2009. (ECF No. 39-18 at 3.) Before that time, she did not oversee officer training and would not have been "in the loop" in the development of any policies to address complaints raised by Mr. Golodner. (*See id.* at 20–21.) Chief Ackley testified that the plaintiff complained about police trespassing on his property as early as 2010. (*Id.* at 26.) She addressed that complaint in a meeting with her command staff. (*See* ECF No. 39-37 at 2.) After receiving an August 2011 telephone call from Mr. Golodner, she "pulled any reports or documentation that we would have had, what we call CAD reports, and dispatches to that property, and reviewed that to see what the situation was." (ECF No. 39-18 at 14–15; ECF No. 47-4 at 3.) On September 23, 2011, Mr. Golodner complained to a shift commander and police dispatcher about the police officers' presence on his property that day. (ECF No. 47-1 at 33.) The dispatcher said that the police were not trespassing and had a right to be there.[5] (*Id.*) In 2012, after receiving a complaint from Mr. Golodner, Chief Ackley sent all of the files that related to Mr. Golodner to New London's legal counsel and the State's Attorney's office for their review. (ECF No. 39-18 at 26–27.) She also examined the files herself to determine if her officers had acted improperly, which led her to conclude that the department had not trespassed illegally. (*Id.*)

Mr. Golodner sent a letter, the contents of which are unclear, to Mayor Wade Hyslop. (ECF No. 39-40 at 2–3.) The mayor forwarded the letter to the City's legal counsel.[6] (*Id.*) In 2009, Mr. Golodner raised concerns with the city council, although he did not mention trespass

---

[5] The defendants argue that this is hearsay. Assuming that it is, the Court will not consider it for the truth of the matter asserted. Fed. R. Evid. 801(c)(2).

[6] The record includes two letters from Mr. Golodner labeled as Exhibit Q (ECF No. 39-20). In one of them, he complains of the August 22, 2008 incident. But that letter is captioned "This copy corrected, amended and not resent to City manager July 2009." (ECF No. 39-20 at 9.) The Court will assume for purposes of this analysis that it was sent to the City Manager.

or search concerns specifically. (ECF No. 39-19 at 3.) The minutes of the meeting refer to "false arrest," "police harassment," and "potential legal action." (*Id.*) He also complained that the mayor would not respond to his letter. (*Id.*)

### D.    Training of New London Police Officers

New London Police Department officers attend training at the Connecticut Police Academy and then every three years. Chief Ackley testified:

> [W]e are given legal training concerning the Fourth Amendment, concerning search and seizure, curtilage, all of the different legal terms. And we receive that there at the academy. And then we go out into the field as police officers and we are mandated to have updates within three years.

(ECF No. 39-18 at 6.) Training records show that the officers involved in the incidents underlying this suit had training in the Fourth Amendment and search and seizure law. (*See generally* ECF No. 39-21 to ECF No. 39-33.) The plaintiff argues that nothing in the training records "demonstrate[s] any training on the right to privacy and the Fourth Amendment's reach into the curtilage of one's home."[7] (ECF No. 47 at 20.) To the contrary, the records show training on "Open Fields/Curtilage." (ECF No. 39-21 at 14; ECF No. 39-26 at 6; ECF No. 39-32 at 2.) Department policy requires officers to be "knowledgeable and conversant" with the law of search and seizure and to follow it. (ECF No. 39-34 at 2, 11.) On September 8, 2011, the New London Police Department received Tier I accreditation from the Police Officer Standards and Training Council ("POST"). (ECF No. 39-36 at 1.) *See also* Conn. Gen. Stat. § 7-294d (describing requirements for certification of police officers). That accreditation means that the department "has established policies and procedures that are accepted as best practices by

---

[7] Curtilage is the "area 'immediately surrounding and associated with the home.'" *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (quoting *Oliver v. U.S.*, 466 U.S. 170, 180 (1984)). Fourth Amendment protections extend to the curtilage of a home. *U.S. v. Dunn*, 480 U.S. 294, 300 (1987). "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Id.* at 300 (citing *Oliver*, 466 U.S. at 180).

national organizations such as the International Association of Chiefs of Police, the National Security Agency and the Commission on Accreditation for Law Enforcement Agencies." (ECF No. 39-36 at 1.)

## II.     Legal Standard on Summary Judgment

Summary Judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . ." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks and citation omitted). "When viewing the evidence, the court must assess the record in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## III.    Statute of Limitations

The defendants argue that the plaintiff's claims are partially time barred, specifically the incidents that occurred on May 18, 2006, and August 22, 2008. The plaintiff argues that those events tend to prove inadequate training and a policy to violate constitutional rights. (ECF No.

48-1 at 10.) He also argues that under the so-called "continuing violation doctrine," those claims are not time barred because the plaintiff "can demonstrate an ongoing or continuing violation of his federally protected rights." (ECF No. 48-1 at 12.)

The state statute of limitations for personal-injury torts applies in cases brought under § 1983. *Wallace v. Kato*, 549 U.S. 384, 387–88 (2007). "In Connecticut, a plaintiff must bring his § 1983 claim within three years of the date his claim accrues." *Barile v. City of Hartford*, 264 F. App'x 91, 91 (2d Cir. 2008) (citing *Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1984)). *See also* Conn. Gen. Stat. § 52-577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."). The issue is whether the plaintiff's claims for the 2006 and 2008 incidents accrued within three years of February 11, 2014, the date he filed this lawsuit.

"Under federal law, which governs when claims brought under §§ 1983 and 1985 accrue, the statute of limitations begins to run once the plaintiff knows of the injury on which the claim is based." *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 331 (2d Cir. 1997) (citing *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994)). "When a plaintiff experiences a 'continuous practice and policy of [constitutional violations], . . . the commencement of the statute of limitations period may be delayed until the last . . . act in furtherance of it.'" *Id. See also Patterson v. Cnty of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (stating in the context of Title VII that "[t]o bring a claim within the continuing violation exception, a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period"). "While discrete incidents of [constitutional violations] that are not related to . . . policies or mechanisms may not amount to a continuing violation, a continuing violation may be found where there is proof of specific ongoing . . . polic[i]es or practices, or

where specific and related instances of [constitutional violations] are permitted by the employer to continue unremedied for so long as to amount to a . . . policy or practice." *Cornwell*, 23 F.3d at 704 (internal quotations and citations omitted).

"Characterizing defendants' separate wrongful acts as having been committed in furtherance of a conspiracy or as 'a single series of interlocking events' does not postpone accrual of claims based on individual wrongful acts." *Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1980) *overruled on other grounds by Roesch v. Otarola*, 980 F.2d 850, 853–54 (2d Cir. 1992), *as recognized in Beberaggi v. N.Y.C. Transit Auth.*, No. 93–CV–1737, 1994 WL 75144, at *5 (S.D.N.Y. Mar. 9, 1994). Rather, "[t]he crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Id.* To allow a plaintiff "to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable him to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims." *Id.*

"[C]ourts of this circuit consistently have looked unfavorably on continuing violation arguments . . . and have applied the theory only under compelling circumstances. Compelling circumstances have been found where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy [that is] alleged to be discriminatory [or constitutionally infirm]; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness." *Ruane v. Cnty of Suffolk*, 923 F. Supp. 2d 454, 459–60 (E.D.N.Y. 2013) (internal quotations and citations omitted).

Those compelling circumstances do not exist in this case. It was not difficult for the plaintiff to determine when the alleged Fourth Amendment violations occurred; the plaintiff was present on both May 18, 2006, and August 22, 2008. (ECF No. 39-6 at 3; ECF No. 39-10 at 2.) Not only does his presence show that it was not "difficult to pinpoint the exact day the violation occurred," *Ruane*, 923 F. Supp. 2d at 459–60, but he sued the City of New London about the 2006 incident.[8] *Golodner v. City of New London*, No. 3:08-CV-1319 WWE, 2010 WL 3522489, at *3, *7 (D. Conn. Sept. 1, 2010) *aff'd*, 443 Fed. App'x 622 (2d Cir. 2011.) Further, as discussed below, the plaintiff has not shown that the defendants' actions are part of an unconstitutional policy or practice, let alone an "express, openly espoused one." *Ruane*, 923 F. Supp. 2d at 459–60. Finally, there are no allegations of "covert conduct." *Id.* Therefore, any claim arising out of the 2006 and 2008 incidents is barred by the statute of limitations. But the 2006 and 2008 incidents can still be considered in deciding whether there was a policy of deliberate indifference that caused the 2011 incidents. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002) (acts falling outside the statute of limitations period "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue") (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)).

The plaintiff's claims are limited to the February and September 2011 incidents, except insofar as the 2006 and 2008 incidents might establish a "policy" of deliberate indifference that caused the 2011 incidents. *See id.* On February 16, 2011, an officer walked onto the plaintiff's property to see if the plaintiff was in his backyard after the police received a report that the plaintiff had been "punching his hand in a menacing manner while looking at" a woman in his neighborhood. (ECF No. 39-13 at 3.) On September 23, 2011, police knocked on his front and

---

[8]   The defendants do not raise any issues of claim preclusion or issue preclusion.

back door because of a report that Mr. Golodner had punched a woman twice in the head and had threatened her that "if the police come my government is going to send you back to your country." (ECF No. 39-16 at 3.) The issue is whether a municipal policy caused the two allegedly unreasonable searches in 2011.

## IV.    The City of New London

"[A] municipality may not be found liable simply because one of its employees committed a tort." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (quoting *Bd. of Cnty Comm'rs v. Brown*, 520 U.S. 397, 405 (1997). To prevail on his claim against the City of New London, Mr. Golodner must prove "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe*, 542 F.3d at 36 (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978)). The parties dispute whether there is evidence of an official policy or custom that caused a constitutional injury, specifically, whether the City had a policy of failing to train its officers and of failing to respond to the plaintiff's complaints. (*See* ECF No. 48-1 at 30.)

A plaintiff may "establish municipal liability by showing that a municipal policy or custom existed as a result of the municipality's deliberate indifference to the violation of constitutional rights, either by inadequate training or supervision." *Russo v. City of Hartford*, 341 F. Supp. 2d 85, 107 (D. Conn. 2004) (citing *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). "To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious." *Vann*, 72 F.3d at 1049 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate

indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."*Id.*[9]

"[D]eliberate indifference is a stringent standard of fault and necessarily depends on a careful assessment of the facts at issue in a particular case." *Cash v. Cnty of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (internal quotations and citations omitted). "The operative inquiry is whether those facts demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'" *Cash*, 654 F.3d at 334.

### A.  Failure to Train

On this record, the City of New London has not exhibited deliberate indifference to a violation of constitutional rights by inadequate training. The plaintiff has not pointed to evidence from which a reasonable juror could infer that a policy maker made the conscious choice not to train officers where "the need for more or better supervision to protect against constitutional violations was obvious." *Id.* (quoting *Vann*, 72 F.3d at 1049). "[T]he Supreme Court emphasized . . . that a plaintiff must establish that 'the officer's shortcomings . . . resulted from . . . a faulty training program' rather than from the negligent administration of a sound program or other unrelated circumstances." *Ahern v. City of Syracuse*, 411 F. Supp. 2d 132, 145 (N.D.N.Y. 2006) (citing *Ahern*, 489 U.S. at 390–91) (footnote omitted).

In his brief, the plaintiff points to the following evidence. Officers entered his property four times without a warrant, once in 2006, once in 2008, and twice in 2011. (ECF No 48-1 at 31.) He states that "[t]raining material given to officers and provided by defendants further

---

[9] "[M]unicipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983). The plaintiff has not pled a failure-to-discipline claim. For the reasons explained in the discussion of the claim of failure to investigate complaints, however, the Court would reach the same result if he had.

demonstrate that defendants received little [or] no training on the fourth amendment concept of curtilage, much less the privacy protection afforded to that area." (ECF No. 48-1 at 31.) He provides citations to the deposition of Chief Ackley and a 2013 edition of the Connecticut Law Enforcement Handbook Field Manual.[10] (ECF No. 47-2 at 6–9; ECF No. 47-6 at 1.)

But neither citation supports his proposition. For example, he says that the "field manual does not even define the term [curtilage]." (ECF No. 48-1 at 31.) To the contrary, the manual states "[a] person can reasonably expect privacy in his home and *the surrounding area or 'curtilage,'* his office, his person and possession." (ECF No. 47-6 at 2 (emphasis added).) The United States Supreme Court uses similar language to describe curtilage, "[t]he area 'immediately surrounding and associated with the home.'" *Jardines*, 133 S. Ct. at 1414 (quoting *Oliver*, 466 U.S. at 180). In addition, Chief Ackley testified:

> [W]e are given legal training concerning the Fourth Amendment, concerning search and seizure, curtilage, all of the different legal terms. And we receive that there at the academy. And then we go out into the field as police officers and we are mandated to have updates within three years.

(ECF No. 39-18 at 6.) She also said: "We received training through the Law Enforcement Council on our legal updates. And if [a warrant was required to enter the curtilage of a home to knock on the door], we most certainly would be well aware of that." (ECF No. 47-2 at 13–14.) When asked whether "all officers in the New London Police Department are trained in" the "Fourth Amendment warrant requirement," she said "Yes." (*Id.* at 14.)

Finally, the plaintiff contends that "no official policy regarding warrantless searches existed prior to 2008." (ECF No. 48-1 at 32.) If so, this does not help the plaintiff because the two allegedly illegal searches that fall within the limitations period in this case took place three

---

[10] The parties apparently agree that the 2013 manual is sufficiently similar to the manual that would have been used during the time in question to be relevant here. (*See* ECF No. 56-1 at 14.)

years after 2008 and the plaintiff submitted no evidence that the absence of an "official policy" in 2008 caused the allegedly unconstitutional violations in 2011.[11]

No reasonable juror could conclude on these facts that the defendants exhibited deliberate indifference to the plaintiff's Fourth Amendment rights on a theory that the defendants failed to train their officers. The plaintiff admits that the "[t]raining records of the [New London Police Department] officers involved in the alleged incidents demonstrate that, at all pertinent times, each officer had training in the Fourth Amendment and search and seizure law . . . ." (ECF No. 47 at 20.) Further, some of those records explicitly refer to "curtilage" training in a list of Fourth Amendment subjects covered during officer training. (ECF No. 39-21 at 14; ECF No. 39-26 at 6; ECF No. 39-32 at 2.) The plaintiff admits that the officers in question received training in constitutionally permissible searches and has pointed to no evidence raising a genuine dispute over whether there was an inadequacy in training "so obvious . . . and . . . so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. Thus, there is insufficient evidence to show that the City's training of its officers amounted to deliberate indifference to the plaintiff's constitutional rights.

The plaintiff refers to an inapposite case against the City of New London to support his position. (ECF No. 48-1 at 31.) In that case, the Court denied a motion to dismiss the plaintiff's *Monell* claims against the City because it determined "that it is plausible that Defendants had an informal custom of 'tolerating police misconduct' and that this custom caused the violations alleged" against the City in the plaintiff's complaint. *Good v. Newton*, No. 3:12-cv-754 (JBA),

---

[11] Further, the plaintiff's suggestion that there was some change in "official policy" in 2008 undermines the notion that the City was deliberately indifferent in that it indicates the City was making an effort to address the issue. (See ECF No. 48-1 at 31–32.)

2013 WL 1087549, at *6–*8 (D. Conn. Mar. 14, 2013). *Good* raises the issue of whether a series of repeated violations alone can demonstrate a policy of failing to train. Perhaps it can, but the alleged violations in this case do not stand alone. This case involves specific affirmative evidence of training on the very rights plaintiff claims were violated and no evidence that the content of the training was inadequate. Thus, viewed most generously to the plaintiff and assuming there were constitutional violations, the evidence in the record shows that the municipality did adequately train its officers, but that on four unrelated occasions spread over half a decade, a handful of officers did not properly apply that training.[12] That is not enough for a *Monell* claim. On this record, no reasonable juror could find that the City is liable under a failure-to-train theory.

### B.     Failure to Investigate Complaints

The plaintiff argues that the City was deliberately indifferent to the alleged violations of his Fourth Amendment rights because the "[d]efendants failed to address any of the plaintiff's complaints." (ECF No. 48-1 at 32.) The record does not bear out that claim. Prior to 2009, the plaintiff sent a letter to Mayor Hyslop complaining about a topic that is not disclosed in the record. (ECF No. 39-40 at 2–3.) Mayor Hyslop forwarded the letter to the City's corporate counsel for review. (ECF No. 39-40 at 2–3.) In 2009, the plaintiff complained to the city council.

---

[12] This view of the record is probably more generous than what a reasonable juror could find, especially given the nature of the first two incidents. In 2006 Mr. Golodner asked to make "a formal" complaint about his neighbor to the officers who approached him, although he says that he did not invite them to enter his property. (ECF No. 39-6 at 3; ECF No. 47 at ¶ 23.) Assuming a constitutional violation occurred in 2006, it is hard to see how the officers' training on curtilage caused the officers to violate Mr. Golodner's constitutional rights when the officers approached a person who asked to make a formal complaint. Likewise, the plaintiff has not pointed to evidence that inadequate training caused the 2008 incident, when police officers accompanied individuals with a statutory right to enter Mr. Golodner's property onto his property after Mr. Golodner tried to prevent them from entering. Both of those incidents, and especially the 2008 incident, involved novel factual scenarios that would likely not be covered in even an adequate training session on "curtilage."

(ECF No. 39-19 at 3.) He did not specifically mention the 2006 or 2008 incidents, and given his contentious history with the City on various other issues, it is not even clear that his complaint involved the issues in this lawsuit.[13] The minutes from that meeting state:

> Daniel Golodner, Colman Street, stated he was here today to raise serious issues regarding mistreatment, misconduct, violation of the City Charter, City Ordinances, civil rights, federal law and state law. He asked to be provided some relief of the issues that he brought up: City Manager not responding to his grievances; Mayor Hyslop not responding to his correspondence; potential legal actions; his call for police assistance and false arrest; police harassment. He would like the State Police to investigate the misconduct, the civil rights violations, the harassment and the abuse of authority by the New London Police Officers involved in the action. He also voiced his concern with the bidding process relative to the building alarm system.

(ECF No. 39-19 at 3.) The minutes reflect that "Mayor Pero asked the City Manager to look into the concerns raised by Mr. Golodner relative to a bid process," but not evidently the allegations of police misconduct. (*Id.* at 5.)

The plaintiff also points to the testimony of Chief Ackley, who testified that Mr. Golodner made a complaint about trespassing on his property by police as early as 2010. (ECF No. 47-2 at 20.) After Mr. Golodner complained in 2010, Chief Ackley addressed the issue of the "Golodner complaint in trespass" at a "Command Staff Meeting." (ECF No. 39-18 at 18–19; ECF No. 39-37 at 2.) Ackley testified that:

> I know at one of those meetings I did express concern to assure that Mr. Golodner was treated with the utmost respect, and that if we are called to his home that we will take a complaint regardless of what had happened in the past concerning the surveyors or any other issues.

> . . .

---

[13] He may have been referring to the events in *State v. Golodner*, 305 Conn. 330 (2012) (criminal case against Mr. Golodner after arrest by City officers); *Golodner v. Berliner*, 770 F.3d 196 (2d Cir. 2014) (suit against City under First Amendment after City solicited bids for security system contract and discontinued its contract with plaintiff's security company in 2005); or *Golodner v. City of New London*, 443 F. App'x 622 (2d Cir. 2011) (suit against City under First Amendment and Fourth Amendment after incident in 2006).

> [M]y advice was to send a supervisor . . . to assure that if Mr. Golodner had a complaint that we were going to take his complaint and follow through on everything.

(ECF No. 39-18 at 19.) It is worth noting that at this time, Chief Ackley was responding to Golodner's complaints about episodes that had taken place two and four years earlier, respectively, one of which was already the subject of litigation. Also, after Mr. Golodner telephoned Chief Ackley to complain in August, 2011, she "pulled any reports or documentation that we would have had, what we call CAD reports, and dispatches to that property, and reviewed that to see what the situation was." (ECF No. 39-18 at 14–15; ECF No. 47-4 at 3.) Evidently, such an extensive review was necessary because, according to Chief Ackley, "he was not complaining about a specific situation." (ECF No. 39-18 at 15.)

Mr. Golodner recounts his August 2011 phone call to Chief Ackley in a rambling email written about six months after the call. According to the email, he urged Chief Ackley not to resign her position; suggested that she contact an attorney because he thought that Chief Ackley was subject to "a negative work environment, discrimination, and possible civil rights violations"; provided Chief Ackley with "Attorney Referrals and Resources"; and discussed an article about Chief Ackley in a newspaper. (ECF No. 47-4 at 3.) He continued:

> Finally, and most importantly I informed you that despite past bad feelings and issues between us, that due to the positive changes you have made with the NLPD, that I was sincerely willing to put them behind us and make a fresh start with you. I got the impression from talking to you that you wanted to better the NLPD and restore public confidence with a zero tolerance toward Officer misconduct, and that I would not be ignored or denied justice again making a formal complaint to you of the many wrongs, abuses and harms including; acts of harassment, false arrests, physical abuses and injuries, civil rights breaches, violations of State and Federal Laws perpetrated against me from 2004–present by those NLPD Officers responsible for those wrongs.
>
> As you know I then requested that you contact the FBI and CT State Police to investigate and take the appropriate actions required regarding those offenses and responsible NLPD Officers which would show your willingness to

18

put the past behind us and would also show people your resolve as to improving the NELDA [sic.] by holding your Officers accountable for their misconducts!

(ECF No. 47-4 at 3–4.) In addition to discussing the August 2011 phone call, Mr. Golodner then made an additional complaint:

> Sadly and frustratingly to date, I have NOT been contacted by any investigator(s), law enforcement agency or any other person or entity regarding my complaint of those many horrible abuses and wrongs perpetrated upon me by NELDA [sic.] Officers for which I pleaded with you for help and justice for me.
> . . .
> I want to inform you that also on your watch presently and recently, I am still being harassed and having my Civil Rights Violated at will by NLPD Officers by repeated acts of criminal trespassing into my Curtilage (if your [sic.] unfamiliar with this term any civil rights Attorney can define it for you) by NLPD Officers and others being escorted by those NLPD Officers!

(*Id.*) Mr. Golodner concluded his email by expressing his lack of confidence in Chief Ackley and said that her "inaction's [sic.] to my complaint . . . will likely force me to again have my Attorney file a complaint with the Courts." (*Id.* at 5.)

On September 23, 2011—apparently after officers entered his property—Mr. Golodner complained to a shift commander and police dispatcher about the police officers' presence on his property that day. (ECF No. 47-1 at 33.) In 2012—after incidents giving rise to this suit occurred—he complained again to Chief Ackley in the email discussed above. (ECF No. 47-4 at 3.) After receiving the email, Chief Ackley sent any files related to Mr. Golodner's complaint and the complaint itself to the State's Attorney and the City's legal counsel. (ECF No. 39-18 at 26–27.) Chief Ackley also reviewed Mr. Golodner's files; she said "[I] read over the files to see what was happening at the time to see if there was anything that we were doing that I needed to put a stop to, [to] make sure that we weren't doing anything that we shouldn't be doing." (ECF No. 39-18 at 27.)

No reasonable juror could conclude from the City's response to Mr. Golodner's complaints that a "municipal policy or custom existed as a result of the municipality's deliberate

indifference to the violation of constitutional rights." *Russo*, 341 F. Supp. 2d at 107. The evidence shows that generally when Mr. Golodner complained about the allegedly unreasonable searches, the party to whom he complained investigated the matter or forwarded the complaint to legal counsel, or both. When the chief of police became aware of Mr. Golodner's complaint, among other things, she addressed the issue at a Command Staff Meeting, reviewed the files, handed over Mr. Golodner's complaint to the State's Attorney, and instructed her staff to send a supervisor to ensure that cases involving Mr. Golodner were handled properly. The FBI may not have contacted Mr. Golodner, as he evidently wished, (ECF No. 47-4 at 3), but soliciting an FBI investigation is hardly necessary for a municipality to show that it was not deliberately indifferent to a citizen's constitutional rights. The undisputed evidence in the record shows that the City did investigate Mr. Golodner's complaints of illegal searches, and provides no support for the notion that the City engaged in "deliberate indifference" or "tacit authorization" of unconstitutional conduct. *Payne v. Cnty of Nassau*, No. 03-cv-192 (DRH) (JO), 2005 WL 2179419, *9 (E.D.N.Y. Sept. 9, 2005) (citing *Batista*, 702 F.2d at 397).

To be sure, the City could have done more to respond to Mr. Golodner's complaints. For example, Chief Ackley could have explicitly reviewed proper procedures for entering the curtilage of a citizen's property with her officers, even though the record shows that they received training on that topic. But the question is not whether the defendants did everything possible to prevent constitutional violations. The "operative inquiry is whether those facts demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'" *Cash*, 654 F.3d at 334. On this record, a reasonable juror could not conclude that the City's response rose beyond the level of "mere negligence" to amount to a "conscious choice" not to make a "meaningful attempt . . . to investigate or to forestall further"

constitutional violations, *Vann*, 72 F.3d at 1049; *Amensty America v. Town of West Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) (requiring that "the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction.").

For these reasons, I grant the motion for summary judgment as to the plaintiff's first claim under 42 U.S.C. § 1983, which alleges violations of the Fourth Amendment against the City of New London.

## V.    Chief Ackley

The plaintiff also brings a claim against Chief Ackley in her individual capacity for allegedly failing to train the officers of the New London Police Department. I grant the defendants' motion for summary judgment on this claim because there is no evidence of a failure to train that amounts to deliberate indifference.

"In this circuit, to sufficiently allege that a supervisor committed a constitutional violation, a plaintiff must show that '(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.'" *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 129 (D. Conn. 2010) (quoting *Colon v. Coughlin,* 58 F.3d 865,

873 (2d Cir. 1995).[14] "Failure to train can constitute the kind of 'deliberate indifference' necessary to hold a supervisor liable when an employee violates the Constitution." *Diaz-Bernal*, 758 F. Supp. 2d at 130 (citing *Harris*, 489 U.S. at 390).

"Courts split over whether a failure to train claim can be the basis for supervisory liability post-*Iqbal*." *Id.* at 132. *Compare Newton v. City of New York*, 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal*."), *with D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (the *Colon* categories survive because they "are not founded on a theory of *respondeat superior*, but rather on a recognition that personal involvement of defendants in alleged constitutional deprivations' can be shown by nonfeasance as well as misfeasance.") (*quoting Colon*, 58 F.3d at 873). Even assuming that "a failure to train can be an active violation on the part of a supervisor who has willfully chosen to allow the harm resulting from a lack of training" *Diaz-Bernal*, 758 F. Supp. 2d at 130, the plaintiff has not shown that a reasonable juror could find Chief Ackley liable under that standard.

Here, there is insufficient evidence to show that Chief Ackley exhibited deliberate indifference to the violation of a constitutional right by willfully failing to train her officers after receiving "information indicating that unconstitutional acts were occurring." *Diaz-Bernal*, 758 F. Supp. 2d at 129–30. Chief Ackley testified that the plaintiff complained to her about police

---

[14] District Courts in the Second Circuit have struggled with whether the categories for establishing personal liability of supervisory personnel set forth in *Colon v. Coughlin* are still good law after *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *E.g.*, *Johnson v. Fischer*, No. 9:12-CV-0210 DNH/TWD, 2015 WL 670429, at *7 n.6 (N.D.N.Y. Feb. 17, 2015) *appeal filed* No. 15-767 (2d Cir. Mar. 11, 2015). The Second Circuit has continued to refer to the *Colon* categories. *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014). I proceed on the assumption that the *Colon* categories continue to provide a proper framework to prove supervisory liability after *Iqbal*.

trespassing on his property as early as 2010. (ECF No. 39-18 at 26–27.) She addressed that complaint in a meeting with her command staff. (ECF No. 39-37 at 2.) She said:

> I know at one of those meetings I did express concern to assure that Mr. Golodner was treated with the utmost respect, and that if we are called to his home that we will take a complaint regardless of what had happened in the past concerning the surveyors or any other issues.
>
> . . .
>
> [M]y advice was to send a supervisor . . . to assure that if Mr. Golodner had a complaint that we were going to take his complaint and follow through on everything.

(ECF No. 39-18 at 19.) After receiving an August 2011 telephone call from Mr. Golodner, she "pulled any reports or documentation that we would have had, what we call CAD reports, and dispatches to that property, and reviewed that to see what the situation was." (ECF No. 39-18 at 15; ECF No. 47-4 at 3.) In 2012—after the allegedly unconstitutional conduct in this case—Mr. Golodner complained again to Chief Ackley; she sent all of the files that related to Mr. Golodner to New London's legal counsel and the State's Attorney's office for their review. (ECF No. 39-18 at 27.) Chief Ackley also examined the files herself to determine if her officers had acted improperly. Her review led her to believe that the department had not trespassed illegally. (*Id.*)

New London Police Department officers attend training at the Connecticut Police Academy and then every three years. Chief Ackley testified:

> [W]e are given legal training concerning the Fourth Amendment, concerning search and seizure, curtilage, all of the different legal terms. And we receive that there at the academy. And then we go out into the field as police officers and we are mandated to have updates within three years.

(ECF No. 39-18 at 6.) Training records also show that the officers involved in the incidents underlying this suit had training in the Fourth Amendment and search and seizure law including training on "Open Fields/Curtilage." (ECF No. 39-21 at 14; ECF No. 39-26 at 6; ECF No. 39-32 at 2.) Her department's policy requires officers to know and to be able to discuss federal laws,

including the law of search and seizure. (ECF No. 39-34 at 2, 11.) Further, Chief Ackley's department was accredited for having a department trained in nationally recognized best practices. (ECF No. 39-36 at 1.)

This record does not show that Chief Ackley was deliberately indifferent to the plaintiff's rights by any action or inaction on her part. It shows that Chief Ackley was concerned with making sure that the officers under her control acted lawfully and were well-trained, not that she "willfully chose[] to allow the harm resulting from a lack of training" to continue. *Diaz-Bernal*, 758 F. Supp. 2d at 132. Even if an illegal search occurred—and I express no opinion on that issue—there is ample evidence that her officers received training on constitutionally permissible searches, including the concept of "curtilage," and the plaintiff has not pointed to evidence to raise a genuine issue of material fact on that point. For these reasons, and the reasons discussed above in Part IV, I grant the motion for summary judgment as to the claim against Chief Ackley in her individual capacity.

## VI.     Conclusion

Because the plaintiff has failed to submit evidence raising a genuine dispute about whether there was a municipal policy or custom that caused any violation of his Fourth Amendment rights or about whether Chief Ackley is liable for a failure to train, I grant summary judgment in favor of the defendants on all claims. The Cross-Motion for Summary Judgment is denied as moot.

For the reasons discussed above, the defendants' Motion for Summary Judgment (ECF No. 39) is GRANTED. The plaintiff's Cross-Motion for Summary Judgment (ECF No. 49) is

DENIED as moot. The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                March 11, 2016